NADINE HAYS
370 Highland Hills Drive
Camarillo, CA 93010
(805) 484-4452
(818) 474-7676 – Fax
NadineHays@aol.com
In Pro Se

**FILED**
CLERK, U.S. DISTRICT COURT

**OCT 10 2012**

CENTRAL DISTRICT OF CALIFORNIA
BY ___LR___ DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT,**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT**

NADINE HAYS, an individual;

        Plaintiff,

vs.

UNITED STATES OF AMERICA, ET AL,

        Defendants..

Case No. **CV11-3198 DMG (PJW)**
Assigned for all purposes to:
Judge: DMG (PJW)
Dept: Currently Courtroom 23 for PJW

**SECOND AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Original Complaint Filed:  4/14/10
Second Amended Complaint Filed:  10/10/12

Trial Date:        None
Discovery Cut Off:    None

**"In a time of universal deceit, telling the truth is a revolutionary act."** -George Orwell

**Introduction**

    Ever since the tragic event with the World Trade Center on September 11, 2001, the United States has been bombarded with the addition of agencies to "keep our country secure." One of the most controversial agency is that of the Transportation Security Administration

**SECOND AMENDED COMPLAINT ("SAC")**

1               10/10/12

1  (TSA), which took on the responsibility of screening passengers at the airports to make sure
2  they were not carrying bombs, guns, or potential lethal weapons.

3        Americans have not been pleased with the harassment they have to endure as they travel
4  in the airports.  It is a requirement to remove the shoes, dispose of all over-sized liquids, remove
5  electronics from their cases, and then to be electronically screened with radiation or physically
6  patted down by agents.

7        Plaintiff, Nadine Hays, encountered such harassment on April 16, 2009 as she tried to get
8  a cooler of snacks passed by the TSA agents at Bob Hope Airport in Burbank, California.  The
9  snacks were for her 93-year old mother who was traveling with her; they were on the way to her
10  nephew's wedding in Nashville, Tennessee.  Two TSA agents, after telling her she could not take
11  the food on board the plane, attempted to steal her property.  After she regained possession of her
12  belongings, she dumped all of the food in the trash can and attempted to board her plane.  The
13  United Airlines boarding agent refused to allow her to board.  Before she knew what was
14  happening, she was cuffed by the Burbank Airport Police, put in a police car, and incarcerated at
15  the Burbank jail for approximately 8 hours.  This was just the beginning of her nightmare which
16  to date is still going on.

17

18                              **Jurisdiction and Venue**

19        This action arises under the Civil Rights Act of 1871, 42 USC § 1983, 1985, and 1987,
20  the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution,
21  Bivens, California Government Code, California Civil Code, California Penal Code, and under
22  California common law.

23        This Court has jurisdiction over the Federal Claims in this action based on 28 U.S.C.,
24  Sections 1331 and 1343.  This Court also has supplemental jurisdiction over the pendent state
25  law claims because the state law claims are so related to the federal claims that they form part of

26

27                      **SECOND AMENDED COMPLAINT ("SAC")**

28                                        2                              10/10/12

1    the same case or controversy under Article III of the United States Constitution, pursuant to 28

2    U.S.C., Section 1367.

3         As far as Plaintiff is aware, the unlawful conduct and illegal practices alleged in this

4    Complaint were committed in the Central District of California. Venue therefore lies in this

5    district, pursuant to 28 U.S.C., Sections 1391(b).

6

7                                    **Parties**

8                                    **PLAINTIFF**

9         Plaintiff NADINE HAYS (hereinafter "HAYS' or "Plaintiff") is, and at all times

10   relevant herein was a resident and citizen of the State of California and the United States.

11   Plaintiff believes she knows many of the Defendants listed below and will be using their names

12   as such in this Complaint. It will only be after Discovery has been conducted that Plaintiff will

13   be able to confirm her beliefs. Any corrections that need to be made will be done at that time.

14

15   **DEFENDANT UNITED STATES OF AMERICA, ITS AGENCIES AND AGENTS**

16   Defendant United States of American (hereinafter "USA").

17   Defendant Department of Homeland Security (hereinafter "DHS"), a cabinet department

18   of the U.S. federal government.

19   Defendant Parlen MC KENNA (hereinafter "MC KENNA"), Administrative Law Judge,

20   U.S. Deparment of Homeland Security.

21   Defendant TRANSPORTATION SECURITY ADMINISTRATION (hereinafter"

22   TSA") is a federal agency under the Department of Homeland Security.

23   Defendant Janet Napolitano (hereinafter "NAPOLITANO"), United States Secretary of

24   Homeland Security. Plaintiff sues NAPOLITANO as an individual and in her official capacity.

25

26

27                      **SECOND AMENDED COMPLAINT ("SAC")**

28                                        3                          10/10/12

1     Defendant John Pistole (hereinafter "PISTOLE"), is the current TSA Adminstrator.

2     Plaintiff sues PISTOLE as an individual and in his official capacity.

3     Defendant Paul Setoudeh (hereinafter "Setoudeh") was the legal counsel for TSA-FOIA.

4     Plaintiff made a request for her FOIA documents on June 15, 2010.  Plaintiff's documents were

5     not sent to her until March 17, 2011, 9 months later.  Plaintiff was functioning at a severe

6     disadvantage as she prepared for her Civil Enforcement lawsuit and as she prepared her original

7     complaint for this lawsuit.  Said delay was not only unprofessional, but it was a denial of her

8     right to due process.

9     DOE 1.  DOE 1 is the heavy-set TSA supervisor that had Plaintiff arrested.  This

10    Defendant  has not as of yet been located.  Plaintiff believes her name to be either Tanya Atkens

11    or Tanya Atkins.  TSA badge number was #64247 according to the paperwork on file at the

12    Burbank Police Department.  It is not known at this time whether this information is accurate or

13    whether it too has been tampered with.

14    DOE 1 placed the Citizen's Arrest on Plaintiff, which resulted in her being handcuffed,

15    incarcerated, and maliciously prosecuted for 18 months.  DOE 1 filed a falsified Police Report,

16    claiming to have done the tug-of-war over the cooler with Plaintiff, when it actuality it was with

17    TETTEH.  DOE 1 claimed that Plaintiff had hit her, which was not true.  DOE 1 was acting

18    under color of law.  Plaintiff sues DOE 1 as an individual and also in her official capacity.

19    Defendant Blanca Morales (hereinafter "MORALES").  Plaintiff believes that

20    MORALES was a TSA supervisor that was sent in to investigate what had happened right after

21    the airport incident.  In the video footage Plaintiff believes it was MORALES that appears to be

22    reprimanding DOE 1for her actions in placing a Citizen's Arrest on Plaintiff.

23    MORALES could have prevented Plaintiff's arrest and vicious prosecution if she had

24    only looked at the airport video surveillance footage.  After confirming her beliefs that a wrong

25    had been committed (DOE 1 had indeed lied regarding what had actually happened),

26

27                       **SECOND AMENDED COMPLAINT ("SAC")**

28                                          4                          10/10/12

1    MORALES could have walked outside the airport doors to the police car and apologized to

2    Plaintiff for her agent's behavior.  Instead she chose to let others "take care of the situation".

3    From this point on lies needed to be told continuously in order to cover up for other lies.

4    MORALES was acting under color of law.  Plaintiff sues MORALES as an individual and also

5    in her official capacity.

6         Defendant TONYA AIKENS (hereinafter "AIKENS"), was an individual employed by

7    the TSA as a supervisor, commonly known as a Lead Transportation Security Officer (LTSO).

8    AIKENS was **not** present at the airport incident on April 16, 2009.  AIKENS signed the

9    Citizens' Arrest form, falsely claiming to have been hit by Plaintiff at the airport on April 16,

10   2009.  This act resulted in Plaintiff being maliciously prosecuted for 18 months.

11        It is the Plaintiff's belief, and she hereby alleges, that the Citizen's Arrest form was

12   originally signed by the heavy-set supervisor, herein named as DOE 1, on the date of Plaintiff's

13   arrest.  Plaintiff believes that at a later time the Citizen's Arrest form was altered, with

14   AIKEN'S name and information being substituted for that of DOE 1.  AIKENS was acting

15   under color of law.  Plaintiff sues AIKENS as an individual and also in her official capacity.

16        Defendant TESIA TETTEH (hereinafter "TETTEH"), was employed by the TSA as a

17   screener at Burbank Airport, commonly known as a Transportation Security Officer (TSO).

18   She is the TSA screener that initially told Plaintiff that none of the food for ALBRECHT,

19   Plaintiff's mother, could go on the plane.  She was the agent that did the tug-of-war over the ice

20   chest with Plaintiff.

21        TETTEH violated TSA protocol by not allowing the food to go through.  The resulting

22   harassment of Plaintiff, who was acting in her mother's behalf, was a direct violation of Title V

23   of the American's With Disability Act.  TETTEH's attempt to keep the ice chest, which

24   rightfully belonged to Plaintiff, was a criminal act of theft.  TETTEH was acting under color of

25   law.  Plaintiff sues TETTEH as an individual and also in her official capacity.

26   _____

27              **SECOND AMENDED COMPLAINT ("SAC")**

28                               5                              10/10/12

1   Defendant STEPHEN WALKER (hereinafter "WALKER"), was a TSA agent who was

2   actively involved in the airport incident.  It is possible to view WALKER laughing numerous

3   times at ALBRECHT, Plaintiff's 93-year old mother, who was being terrorized by agents in the

4   pat-down area.  As the prosecution prepared for trial and interviewed various TSA agents,

5   WALKER made some very defamatory remarks about Plaintiff to create an appearance that

6   Plaintiff was a terrible person.  WALKER was acting under color of law.  Plaintiff sues

7   WALKER as an individual and also in his official capacity.

8   Defendant KELLY BERG (hereinafter "BERG") was an individual employed by the

9   TSA  She was the individual that performed the pat-down to Plainiff's' mother, Eleanor

10  Albrecht (hereinafter "ALBRECHT").  As the prosecution prepared for trial and interviewed

11  various TSA agents, BERG made some very defamatory remarks about Plaintiff to create an

12  appearance that Plaintiff was a terrible person.   BERG was acting under color of law.  Plaintiff

13  sues BERG as an individual and in her official capacity.

14  Defendant Stuart Tooles (hereinafter "TOOLES") was involved in an e-mail

15  communication with Emily Daum.  His exact participation in the corrupt and illegal acts related

16  to this case are yet to be discovered.  Plaintiff sues TOOLES as an individual and also in his

17  official capacity.

18  Defendant Emily Daum (hereinafter "DAUM") was an Assistant Federal Security

19  Director at the Burbank Airport on April 16, 2009.  DAUM wrote up the investigative report

20  which continually made defamatory remarks and lies about Plaintiff.  DAUM was involved with

21  an e-mail correspondence regarding a cell phone video that was sent in by Dave Vogl, a

22  passenger.

23  Plaintiff believes, and thereby alleges, that both the cell phone video and the e-mail were

24  altered by DAUM and her accomplices, to make Plaintiff appear as a very "out of control"

25  individual.  Plaintiff also believes that DAUM  obtained a copy of the airport surveillance

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                                6                          10/10/12

1  video, turned it over to someone for it to be modified to make Plaintiff appear to be hitting the

2  TSA agent. DAUM then worked together with another individual, possibly ROSS, in having

3  the altered evidence switched out in place of the original in the evidence room. Said altered

4  evidence was then used in Plaintiff's criminal prosecution as well as in the Civil Enforcement

5  lawsuit initiated by TSA against Plaintiff. DAUM was acting under color of law. Plaintiff sues

6  DAUM as an individual and also in her official capacity.

7     Defendant Danny Turner (hereinafter "TURNER") was a TSA employee that allowed

8  the Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

9  involved in the airport incident had violated TSA protocol numerous times. It made many

10  deceitful comments which were very defamatory to Plaintiff's character. TURNER was acting

11  under color of law. Plaintiff sues TURNER as an individual and also in his official capacity.

12     Defendant Jimmy Ledesma (hereinafter "LEDESMA") was a TSA employee that

13  allowed the Incident Report to be filed. It was filled with lies. It never addressed the fact that

14  the agents involved in the airport incident had violated TSA protocol numerous times. It made

15  many deceitful comments which were very defamatory to Plaintiff's character. LEDESMA was

16  acting under color of law. Plaintiff sues LEDESMA as an individual and also in his official

17  capacity.

18     Defendant Geoff Shearer (hereinafter "SHEARER") was a TSA employee that allowed

19  the Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

20  involved in the airport incident had violated TSA protocol numerous times. It made many

21  deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues

22  SHEARER as an individual and also in his official capacity.

23     Defendant Phillip Tran (hereinafter "TRAN") was a TSA employee that allowed the

24  Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

25  involved in the airport incident had violated TSA protocol numerous times. It made many

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                     10/10/12

1  deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues TRAN

2  as an individual and also in his official capacity.

3      Defendant James Jung (hereinafter "JUNG") was a TSA employee that allowed the

4  Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

5  involved in the airport incident had violated TSA protocol numerous times. It made many

6  deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues JUNG

7  as an individual and also in his official capacity.

8      Defendant Thomas Thang (hereinafter "THANG") was a TSA employee that allowed

9  the Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

10  involved in the airport incident had violated TSA protocol numerous times. It made many

11  deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues THANG

12  as an individual and also in his official capacity.

13      Defendant Mariana Mansaray (hereinafter "MANSARAY") was a TSA employee that

14  allowed the Incident Report to be filed. It was filled with lies. It never addressed the fact that

15  the agents involved in the airport incident had violated TSA protocol numerous times. It made

16  many deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues

17  MANSARAY as an individual and also in her official capacity.

18      Defendant Kenneth Gentry (hereinafter "GENTRY") was a TSA employee that allowed

19  the Incident Report to be filed. It was filled with lies. It never addressed the fact that the agents

20  involved in the airport incident had violated TSA protocol numerous times. It made many

21  deceitful comments which were very defamatory to Plaintiff's character. Plaintiff sues

22  GENTRY as an individual and also in his official capacity.

23      Defendant Suzanne Trevino (hereinafter "TREVINO") appears to be involved with the

24  legal department of Homeland Security. She could be involved in the cover-up regarding the

25

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                                           10/10/12

1  tampering with evidence.  Plaintiff sues TREVINO as an individual and also in her official

2  capacity.

3      Defendant Greg Soule (hereinafter "SOULE") appears to be involved with the legal

4  department of Homeland Security.  He could be involved in the cover-up regarding the

5  tampering with evidence.  Plaintiff sues SOULE as an individual and also in his official

6  capacity.

7      Defendant Skip Williams (hereinafter "WILLIAMS") was the Deputy Director,

8  Southwest Area, for the Transportation Security Administration.  His involvement is yet to be

9  discovered.  He was mentioned in Plaintiff's FOIA documents.  If found involved in the crimes

10  of this case Plaintiff will sue WILLIAMS as an individual and also in his official capacity.

11      Defendant Brian Cahill (hereinafter "CAHILL") was the Federal Security Director for

12  TSA at the Burbank Airport.  His complete involvement is yet to be discovered.  He was

13  mentioned in Plaintiff's FOIA documents.  He did make a false statement that Plaintiff had

14  accepted the plea bargain; at this time it is not certain if this went out to the news media; it

15  appears as it did by the way the e-mail was written.  If found involved in the crimes and/or

16  offenses of this case, Plaintiff will sue CAHILL as an individual and also in his official

17  capacity.

18      Defendant Jack Shea (hereinafter "SHEA") is hereby named.  SHEA's involvement is

19  yet to be discovered.  He was mentioned in Plaintiff's FOIA documents.  If found involved in

20  the crimes of this case, Plaintiff will sue SHEA as an individual and also in his official capacity.

21      Defendant Nico Melendez (hereinafter "MILENDEZ") is hereby named.  His

22  involvement is yet to be discovered.  He was mentioned in Plaintiff's FOIA documents.  If

23  found involved in the crimes of this case, Plaintiff will sue MILENDEZ as an individual and

24  also in his official capacity.

25

26

27                        **SECOND AMENDED COMPLAINT ("SAC")**

28                                    9                              10/10/12

# DEFENDANT BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY, ITS AGENCIES AND AGENTS

## BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY

This is the separate governmental agency in charge of the Burbank-Glendale-Pasadena Airport. The Authority consists of nine commissioners, three from each city. The commissioners from each city are appointed by their city council.

The following individuals were members of the BGPAA and were believed to have the capability of uncovering the truths regarding this case if so desired. Although they are not currently being sued, Plaintiff retains the right to do so if they were involved in any of the criminal activity related to her case.

1. Don Brown (hereinafter "BROWN", Burbank
2. Bill Wiggins (hereinafter "WIGGINS"), Burbank
3. Charles Lombardo; Burbank (hereinafter "LOMBARDO") (deceased)
4. Frank Logan (hereinafter "LOGAN"), Pasadena
5. Chris Holden (hereinafter "HOLDEN"); Pasadena
6. Joyce Streator (hereinafter "STREATOR"), Pasadena
7. Rafi Manoukian (hereinafter " MANOUKIAN"),  Glendale.
8. Dave Weaver, (hereinafter "WEAVER"),  Glendale
9. Frank Quintero (hereinafter "QUINTERO"), Glendale

Agents working for the GBPAA at the airport in supervisory roles included:

Defendant Rick Magio (hereinafter "MAGIO") His involvement is yet to be discovered. He was mentioned in Plaintiff's FOIA documents. If found involved in the crimes of this case, Plaintiff will sue MAGIO as an individual and also in his official capacity.

---

**SECOND AMENDED COMPLAINT ("SAC")**

10                                                    10/10/12

1   Defendant Joe Mills (hereinafter "MILLS").  His involvement is yet to be discovered.

2   He was mentioned in Plaintiff's FOIA documents.  If found involved in the crimes of this case,

3   Plaintiff will sue MILLS as an individual and also in his official capacity.

4   Defendant Richard Still (hereinafter "STILL") .His involvement is yet to be discovered.

5   He was mentioned in Plaintiff's FOIA documents.  If found involved in the crimes of this case,

6   Plaintiff will sue STILL as an individual and also in his official capacity.

7   Defendant Marquise ? (hereinafter "MARQUISE ?" until a full name is revealed) His

8   involvement is yet to be discovered.  He was mentioned in Plaintiff's FOIA documents.  If

9   found involved in the crimes of this case, Plaintiff will sue MARQUISE as an individual and

10   also in his official capacity.

11

12   THE BURBANK-GLENDALE-PASADENA AIRPORT AUTHORITY POLICE

13   (HEREINAFTER "BURBANK AIRPORT POLICE")

14   This is the law enforcement agency for the Bob Hope or Burbank Airport in the city of

15   Burbank, California.  Its relationship to the Burbank Police Department right now is not clear.

16   Plaintiff was told that it is totally separate from the Burbank Police Department and that they

17   only utilize the jail and evidence storage facilities at the Burbank Police Department.

18   Although the arresting officers were employed by the Burbank Airport Police, according

19   to the reports the arresting agency was the Burbank Police Department.

20   The Burbank Airport Police is being sued in its official capacity.

21   Agents working under the Burbank Airport Police include:

22   Defendant Kakumu (hereinafter "KAKUMU") was an officer of the Burbank Airport

23   Police.  Officer KAKUMU was the first officer on the scene and was in charge of the retention

24   of Plaintiff before the arresting officers arrived.  KAKUMU told Plaintiff she was not going to

25   be arrested even though he knew the arresting officers were on their way to arrest her.

26

27   **SECOND AMENDED COMPLAINT ("SAC")**

28   11                                          10/10/12

1    Defendant Green (hereinafter "GREEN"), was an officer of the Burbank Airport Police.

2    Officer Green failed to perform a satisfactory investigation before proceeding with the arrest of

3    Plaintiff.  Instant replay video was available.  If GREEN had viewed it, he would have

4    immediately noticed that the agent placing the Citizen's Arrest was lying.  He never obtained a

5    single non-biased opinion from any of the passengers walking through the area at the time of the

6    incident.  He was very rude to Plaintiff when she stated that she had a medical need to have a

7    chair while waiting to be booked.  He refused to accommodate, thus forcing Plaintiff to sit on

8    her buttocks while both hands were cuffed behind her.  Plaintiff sues GREEN as an individual

9    and also in his official capacity.

10        Defendant Albaro (hereinafter "ALBARO") was an officer of the Burbank Airport

11    Police.  ALBARO failed to perform a satisfactory investigation before proceeding with the

12    arrest of Plaintiff.  Instant replay video was available.  If ALBARO had viewed it, she would

13    have immediately noticed that the agent placing the Citizen's Arrest was lying.  She never

14    obtained a single non-biased opinion from any of the passengers walking through the area at the

15    time of the incident.   Plaintiff sues ALBARO as an individual and also in her official capacity.

16        Defendant Depot (hereinafter "DEPOT") was an officer of the Burbank Airport Police.

17    Plaintiff believes he was called onto the alleged crime scene after Plaintiff had left the area.  He

18    told Plaintiff's husband that Plaintiff had injured two agents, which was not true.  Plaintiff is not

19    certain of DEPOT's spelling at this time; it will be discovered later and if necessary, will be

20    corrected.  Plaintiff sues DEPOT as an individual and also in his official capacity.

21        Defendant NEAL (hereinafter "NEAL") conducted an internal affairs investigation within

22    the Burbank Airport Police Department.  Plaintiff had supplied him with a list of questions to be

23    answered in the investigation.  NEAL failed to answer the questions asked.  Plaintiff sues

24    NEAL as an individual and also in his official capacity.

25

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                    12                         10/10/12

1   Defendant FURGIVELE (hereinafter "FURGIVELE) worked with NEAL in conducting

2   the internal investigation with NEAL.  The results of their investigation were very poor and did

3   not satisfy the Plaintiff's questions that were asked.

4

5   **DEFENDANT CITY OF BURBANK, ITS AGENCIES AND AGENTS**

6   Defendant Burbank Police Department  (hereinafter "BPD") is the law enforcement

7   agency of the City of Burbank, California.  Plaintiff sues BPD in its official capacity.  Agents of

8   the Burbank Police Department include:

9   Defendant Mitch Ross (hereinafter "ROSS") was a detective for the Burbank Police

10  Department at the time of the airport incident and was assigned to be the detective for Plaintiff's

11  case.  ROSS had ready access to all evidence in the evidence locker, including the airport

12  surveillance DVD and the Citizen's Arrest form.  ROSS failed to provide proper protection of

13  the evidence when it was checked out.  It is the Plaintiff's belief, and she hereby alleges, that

14  Ross could be a primary suspect for removing the actual evidence in the evidence room and

15  replacing it with altered evidence that could have been provided to him by DAUM.  ROSS was

16  acting under color of law.   Plaintiff retains the right to sue Ross as an individual as well as in

17  his official capacity.

18  Defendant HAWVER (hereinafter "HAWVER") was assigned by the Chief of Police to

19  do an internal affairs investigation.  He was acting under color of law.  Plaintiff sues HAWVER

20  as an individual as well as in his official capacity.

21  Defendant LA CHASSE (hereinafter "LA CHASSE) is the current Chief of Police for

22  Burbank Police Department.  LA CHASSE had ordered an internal affairs investigation to be

23  done by HAWVER.  Said investigation has not been formally produced; Plaintiff's questions

24  were not satisfactorily answered.  Plaintiff sues LA CHASSE as an individual as well as in his

25  official capacity.

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                          13                              10/10/12

1       Defendant CREMINS (hereinafter "CREMINS") was the Commander for the

2   Investigative Division of the Burbank Police Department in 2011.  Plaintiff insisted that the

3   Burbank Police Department do a thorough investigation regarding the crimes that were

4   committed against her.  CREMINS insisted that everything was a Federal matter and did not fall

5   under the jurisdiction of the Burbank Police Department.  Plaintiff sues CREMINS as an

6   individual as well as in his official capacity.

7       Defendant Burbank City Attorney's Office  is the prosecuting arm for misdemeanor

8   crimes in the city of Burbank, CA.  Plaintiff sues the Burbank City Attorney's Office in its

9   official capacity.  Agents of the Burbank City Attorney's Office are:

10      Defendant Denny Wei, (hereinafter "WEI") was the Deputy Attorney.  WEI was the lead

11  agent in the Plaintiff's criminal prosecution.  Extortion was used against Plaintiff by WEI when

12  he tried to coerce Plaintiff to accept a plea bargain.  Plaintiff continually told WEI that she

13  never hit anyone and that he was prosecuting her on a falsified Police Report.  WEI refused to

14  listen.  WEI refused to have the police properly investigate the case.  Instead, WEI threatened to

15  put Plaintiff in jail, if at all possible, if she refused to go along with the plea bargain.  Plaintiff

16  sues WEI as an individual as well as in his official capacity.

17      Defendant Dennis Barlow (hereinafter "BARLOW") was the City Attorney for the City

18  of Burbank at the time Plaintiff was being prosecuted.  Plaintiff wrote BARLOW several letters

19  describing her innocence and pleading for him to investigate so she would not be criminally

20  prosecuted.  BARLOW refused to do anything to help Plaintiff prove her innocence.  Plaintiff

21  sues BARLOW as an individual as well as in his official capacity.

22      Defendant Olga Baker (hereinafter "BAKER") became the acting prosecutor in

23  Plaintiff's criminal case.  Plaintiff sues BAKER as an individual as well as in her official

24  capacity.

25

26

27                      **SECOND AMENDED COMPLAINT ("SAC")**

28                             14                    10/10/12

1    Defendant Carol Humiston (hereinafter "HUMISTON") made a very defamatory

2   comment regarding Plaintiff's character on December 20, 2011.  Plaintiff let HUMISTON know

3   that she was offended.  HUMISTON would not apologize.  Plaintiff has great pride in her

4   reputation as a person of good stature and said defamation in a public document was extremely

5   offensive.  Plaintiff is willing to remove HUMISTON as a defendant if she merely publicly, in a

6   court recorded document, apologizes for the demeaning statement that she made and that she

7   admits that it was a lie.

8

9   **DEFENDANT LOS ANGELES DISTRICT ATTORNEY'S**

10   **OFFICE AND ITS AGENTS**

11    This is the prosecuting agency for felony crimes in the City of Los Angeles.  It is being

12   sued in its official capacity.

13    Agents of the Los Angeles District Attorney's Office that are being sued include:

14    Defendant JOHN MOULIN (hereinafter "MOULIN") was asked by Plaintiff to

15   investigate the charges brought against officials in the judicial and law enforcement agencies.

16   He refused to do anything.

17    Defendant JAMES GARRISON (hereinafter "GARRISON") was asked by Plaintiff to

18   investigate the charges brought against officials in the judicial and law enforcement agencies.

19   He refused to do anything.

20

21   **DEFENDANT AMERICAN AIRLINES, ITS AGENCIES AND AGENTS**

22    Defendant American Airlines was the carrier Plaintiff was ticketed on when the airport

23   incident occurred.

24    Defendant Airport Terminal Services (hereinafter "ATS") is a ground handling company

25   for airports, with operations throughout the continental US and Canada.  It often times provides

26

27   **SECOND AMENDED COMPLAINT ("SAC")**

28                                    15                                    10/10/12

1   personnel at the airports.  It was an agency hired by American Airlines to supply personnel at

2   Burbank airport.  It is being sued in its official capacity.

3       Defendant Jean Massingale (hereinafter "MASSINGALE") worked for ATS and was the

4   boarding agent at the American Airlines counter where Plaintiff attempted to board her ticketed

5   plane.  MASSINGALE refused to allow Plaintiff to board, claiming that she was a threat to her

6   passengers.  Plaintiff tried to explain to MASSINGALE what had actually happened, namely

7   that the agents had tried to steal her property, but MASSINGALE refused to listen.  She made

8   no attempt to find out the truth and instead relied on her personal, subjective beliefs, which

9   resulted in a very poor judgment call.  Plaintiff sues MASSINGALE as an individual and also in

10  her official capacity.

11      Plaintiff is willing to remove MASSINGALE as a defendant if she will simply apologize

12  and speak honestly to Plaintiff so she can properly prepare for her Federal lawsuit trial.

13

14            **DEFENDANT LOS ANGELES POLICE DEPARTMENT**

15      Defendant Los Angeles Police Department  (hereinafter "LAPD") is the law

16  enforcement agency for the city of Los Angeles.  It is being sued in its official capacity.

17      Defendant Detective LaDuff (hereinafter "LA DUFF") was the detective assigned to

18  Plaintiff's False Impersonation claim.  He failed to properly investigate Plaintiff's claim and

19  consequently a felon is still at large.  LA DUFF was acting under color of law.   Plaintiff sues

20  LA DUFF as an individual as well as in his official capacity.

21      Defendant Detective Brownell (hereinafter "BROWNELL") was LA DUFF's

22  supervisor.  BROWNELL, together with LA DUFF, failed to properly investigate Plaintiff's

23  claim and consequently a felon is still at large.  BROWNELL was acting under color of law.

24  Plaintiff sues BROWNELL as an individual as well as in her official capacity.

25

26

27                **SECOND AMENDED COMPLAINT ("SAC")**

28                   16                  10/10/12

1        Defendant Detective Tinker (hereinafter "TINKER") was the detective that wrote up the

2   investigation report that was submitted to the City Attorney's office. TINKER failed to do the

3   second part of Plaintiff's requested investigation, which was to call Plaintiff into the station

4   when AIKENS was there. Together they were to watch the surveillance video from the airport

5   and Plaintiff would prove that AIKENS was an imposter, pretending to have been involved in

6   the airport incident when in fact she was not. Because TINKER failed to do this, AIKENS has

7   fled her apartment and currently has not been relocated. TINKER was acting under color of

8   law. Plaintiff sues TINKER as an individual as well as in his official capacity.

9        Defendant Burt Gutierrez (hereinafter "GUTIERREZ") is the officer with the LAPD that

10  informed Plaintiff to not bother the detectives at the LAPD's West Valley station as "they are

11  very busy and your request is outside of their normal course of duty," GUTIERREZ insists that

12  LAPD does not have jurisdictional authority over this matter. He stated: "It occurred in

13  Burbank. Your best course of action remains through the court system or via the complaint

14  process of the involved agencies. You may direct your inquiries to me; however, if the

15  circumstances have remained essentially the same, my recommendations will be as before."

16       GUTIERREZ is aidding and abetting a felon and is refusing to do his job as a law

17  enforcement agent. Plaintiff has explained that for right now she is claiming that the signature

18  on the Citizen's Arrest form could have likely occurred at AIKENS home, which is in the

19  jurisdiction of the LAPD. Plaintiff was very clear to GUTIERREZ that AIKENS was not a part

20  of the airport incident on April 16, 2009. GUTIERREZ still refuses to take action.

21       GUTIERREZ was acting under color of law. Plaintiff sues GUTIERREZ as an

22  individual as well as in his official capacity.

23

24  **MISCELLANEOUS DEFENDANTS IN THIS SUIT**

25

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                 17             10/10/12

1    Defendant Renato Medina (hereinafter "MEDINA") was Plaintiff's first criminal

2 defense attorney. Being hired and paid for his professional services to exonerate Plaintiff,

3 MEDINA had an obligation to properly investigate Plaintiff's allegations and to fight for the

4 dismissal of her case. Instead, MEDINA carried the case to the point of a plea bargain being

5 offered. MEDINA then advised Plaintiff that he felt the plea bargain was a good offer and that

6 he felt she should take it.

7    Plaintiff was shocked that MEDINA was not willing to investigate and fight for her

8 innocence, which is why Plaintiff hired him for in the first place. Plaintiff could have done

9 better fighting her case as a pro se litigant, which would have saved her $1,000.

10    By law MEDINA had a duty to present Plaintiff with an itemized bill, showing her how

11 her retainer's fee had been spent. MEDINA failed to do so.

12    Because of MEDINA's refusal to move forward with Plaintiff's case, Plaintiff had no

13 other alternative than to find a new attorney. This was an extremely difficult task for Plaintiff to

14 do at the time, as she was suffering immensely from the symptoms of Post Traumatic Stress

15 Disorder (PTSD). Plaintiff had great difficulty functioning with daily life, let alone having to

16 deal with the added pressures of this legal struggle. Plaintiff sues MEDINA in his individual

17 capacity.

18    Plaintiff is willing to remove MEDINA as a defendant if he will apologize for his

19 mistakes and simply speak honestly to Plaintiff so she can properly prepare for her Federal

20 lawsuit trial.

21    Defendant Mary Frances Prevost (hereinafter "PREVOST") was Plaintiff's second

22 criminal attorney. Plaintiff appreciates the fact that the criminal charges were finally dismissed

23 and gives credit to PREVOST for helping to see that accomplished. Plaintiff is suing

24 PREVOST at this time, however, for her unethical practices and for her failure to comply with

25 Court orders. Plaintiff is willing to remove PREVOST as a defendant if she will apologize for

26

27    **SECOND AMENDED COMPLAINT ("SAC")**

28       10/10/12

1 | her wrongs and simply speak honestly with Plaintiff so Plaintiff can properly prepare for her

2 | Federal lawsuit trial.

3 |      Judge APPLEGATE (hereinafter "APPLEGATE") refused to grant discovery to

4 | Plaintiff to help her prepare for her criminal prosecution. If Discovery had been allowed

5 | Plaintiff would have been able to prove that she had been prosecuted on a falsified police report.

6 |      Plaintiff believes, and thereby alleges, that APPLEGATE was working together with the

7 | prosecution in order to help the prosecution attain more convictions. This is a very unethical

8 | practice and can result in innocent individuals being found guilty when they go to trial merely

9 | because they did not have sufficient evidence, generally obtained through discovery, to prepare

10 | a proper defense. APPLEGATE used his position in court to manipulate the potential outcome

11 | of Plaintiff's case, which is an abuse of power.

12 |      Plaintiff's attorney PREVOST saw what APPLEGATE was doing and therefore

13 | challenged him in court and had the trial moved to Glendale, where Plaintiff was assigned to a

14 | fair judge rather than a partial one.

15 |      Plaintiff is willing to remove APPLEGATE as a defendant if he will apologize for his

16 | wrongs and simply speak honestly with Plaintiff so Plaintiff can properly prepare for her

17 | Federal lawsuit trial.

18 |

19 |      Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as

20 | DOES 1 through 10, inclusive, and therefore sues such Defendants by said fictitious names.

21 | Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when

22 | the same are ascertained. Plaintiff is informed and believes, and thereupon alleges that said

23 | DOE Defendants are in some manner intentionally or negligently responsible for the wrongs

24 | and injuries hereinafter alleged and that Plaintiffs' injuries were proximately caused by said

25 | acts. The DOE Defendants are being sued in their individual and official capacities.

26 |

27 | **SECOND AMENDED COMPLAINT ("SAC")**

28 |         10/10/12

1    Plaintiff is informed and believes, and on that basis alleges, that each and every act

2  alleged in this Complaint to have been done by the Defendants and/or their agents, officers and

3  employees, as herein alleged, was done by each Defendant, along with the DOE Defendants, in

4  the execution and implementation of the official policies, practices and customs of the

5  respective employers, i.e., the TSA, the Burbank Airport Police, the City of Burbank, the

6  Burbank Police Department, etc.

7    Plaintiff is informed and believes, and on that basis alleges that many of the Defendants

8  were the agent and employee of many of the remaining Defendants and, in doing the things

9  hereinafter alleged, were acting within the course and scope of such agency and employment

10  with the knowledge, consent and ratification of the other Defendants.

11    Many of the defendants in this case acted as individuals, and they also acted under color

12  of authority and pretense of the laws, statutes, regulations, customs and usage of the United

13  States of America, the State of California, the County of Los Angeles, the City of Burbank and

14  under the authority of their official capacities.

15    Many of the above named Defendants, in doing the things complained of herein, acted

16  with many of the other Defendants in conspiracy and with the knowledge and consent and at the

17  instructions of the other Defendants.  Said acts occurred in the scope of and in furtherance of

18  such conspiracy.  Said Defendants acted so, willfully, knowingly and purposefully, with the

19  specific intent to injure Plaintiff as is more particularly described hereinafter.

20    Defendants had a duty to Plaintiff to make sure she was treated fairly and with respect

21  and failed to act when they had the duty to do so, Plaintiff suffered, *inter alia*, trespass to her

22  chattels, an arrest without probable cause, being handcuffed in front of her 93 year old mother

23  in public view, being subjected to a mandatory strip search at the Burbank Police Department,

24  spending approximately seven  hours in detention under arrest at Burbank City Jail, being

25

26

27    **SECOND AMENDED COMPLAINT ("SAC")**

28                       10/10/12

1 │ maliciously prosecuted for 18 months, incurring the cost of legal representation in her defense

2 │ of more than $15,000, public embarrassment, humiliation and emotional stress.

3 │     During the 18-month criminal prosecution time period, all Defendants persecuted

4 │ Plaintiff.  Defendants never had probable cause to believe that Plaintiff had ever committed a

5 │ crime of any kind.

6 │     Crimes and civil offenses continued and are continuing on an on-going basis, even after

7 │ the criminal and civil cases against Plaintiff were dismissed.

8 │

9 │

10 │ **DAMAGES**

11 │

12 │     As an actual and proximate result of the fact that Defendants criminally prosecuted

13 │ Plaintiff, Plaintiff incurred attorneys fees in excess of $15,000, incurred substantial  personal

14 │ expenses, suffered humiliation, mental anguish, nervous distress, sleeplessness, and disruption

15 │ to her relationship with her family and husband, was unable to work due to stress caused by the

16 │ prosecution and therefore lost income, and incurred medical and other health care expenses.

17 │     Plaintiff has not been able to function as a mother, a grandmother, and a wife due to the

18 │ stress of being maliciously prosecuted for a crime she did not commit.

19 │     Plaintiff's family members were likewise traumatized by all of the events that occurred

20 │ after the April 16, 2009 arrest.

21 │     Plaintiff lost the support of both family and friends when they viewed the surveillance

22 │ video.  Many thought Plaintiff had acted inappropriately in defying the orders of the TSA

23 │ agents.

24 │     Plaintiff needed to find a new circle of friends.  She went the Tea Party Patriots

25 │ convention in Phoenix, AZ in February, 2011.  She joined the protestors of Occupy in

26 │

27 │ **SECOND AMENDED COMPLAINT ("SAC")**

28 │          10/10/12

1   September, 2011. During the week of July 4, 2012 she was a congressional district delegate at

2   the Continental Congress 2.0 in Philadelphia, PA, where a formal redress of grievances was

3   assembled, to be presented to Congress and President Obama. Said political activism had never

4   been a part of Plaintiff's life prior to the horrific airport incident and can be directly attributed to

5   the airport incident and the actions of the Defendants in this case.

6          Plaintiff's family has had great difficulty adapting to the "new normal" as the

7   psychologists have termed it...a change that needs to be accepted and not expected to ever go

8   back to "the way things used to be."

9

10                  **FACTS AND ANALYSIS COMMON TO ALL CLAIMS FOR RELIEF**

11

12                                      **The Airport Incident**

13          Plaintiff Nadine Hays entered Bob Hope Airport in Burbank, California on Thursday,

14   April 16, 2009 with her 93-year old mother, Eleanor Albrecht (ALBRECHT) and

15   ALBRECHT's caregiver, Mele Kuli (KULI). They were all going to ALBRECHT's grandson's

16   wedding in Nashville, Tennessee.

17          Before leaving on this trip, Plaintiff had called the TSA Customer Service call center

18   and asked if she would have any problem carrying food and beverage on the plane for her

19   elderly mother. She explained that her mother had special needs, as in the past she had been

20   hospitalized for dehydration and she frequently had diarrhea if she did not keep solid foods

21   going through her digestive system. The individual at the call center informed Plaintiff that the

22   TSA agents had been trained and knew what to do with individuals with special needs. Plaintiff

23   was reassured that she would not encounter any problems and that she could check their website

24   to confirm what she had just been told.

25

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                              22                              10/10/12

1    When Plaintiff entered the security screening area she was separated from ALBRECHT,

2  her mother, who was in a wheel chair and needed to be wheeled to a special pat-down screening

3  area, as the wheel chair could not go through the metal detector. ALBRECHT's shoes had been

4  removed like all other passengers. ALBRECHT did not like this action, as her feet got cold

5  very easily. ALBRECHT became very agitated at the treatment she was given by the TSA

6  agents. This action violated TSA protocol which stated that elderly individuals do not have to

7  take off their shoes.

8    The cooler of snacks was opened by TETTEH, the TSA screener. TETTEH told

9  Plaintiff that none of the food could go on the plane. Plaintiff asked for her supervisor. DOE 1,

10 the supervisor, agreed with the screener and said none of the items could go on the plane. Both

11 agents refused to cooperate, even after HAYS had explained to them that the food was a

12 medical necessity for ALBRECHT and that the TSA Call Center had told her that she would

13 have no problems taking the items on board the plane.

14    DOE 1, the supervisor, closed the ice chest and started to walk away from Plaintiff in the

15 direction of the concession stand. TETTEH followed DOE 1. TSA protocol was violated, as

16 Plaintiff was not informed as to what her options were concerning items in the cooler. Plaintiff's

17 property had just been unlawfully taken from her without her permission.

18    Since nothing had been said to Plaintiff as to what they planned on doing with her

19 property, Plaintiff left the screening area and went after the two TSA agents.

20    Plaintiff stopped the two agents about 20 feet away from the screening area. Plaintiff

21 pleaded with the agents to allow the cooler of snacks to go on the plane. Plaintiff was fearful of

22 the consequences that might happen regarding the physical welfare of her mother should she not

23 be allowed to carry the food on board.

24    Plaintiff tried to explain to both TETTEH and DOE 1 that if they were not going to

25 allow the food to go on the plane, could they please allow it to go in the baggage compartment

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                          23                        10/10/12

1  with ALBRECHT's wheelchair. Plaintiff, ALBRECHT, and KULI were going to have a

2  layover in Dallas/Fort Worth, so Plaintiff figured she would be able to get to the food at that

3  time and give her mother the required nourishment.

4       DOE 1 told HAYS, "No… we're going to confiscate everything."

5       Fearful for her mother's welfare, Plaintiff reached for her cooler. DOE 1 passed the

6  cooler to TETTEH, so the cooler was now being held by TETTEH and Plaintiff. A tug-of-war

7  occurred over the cooler. When Plaintiff saw TETTEH look up at DOE 1 with a smile on her

8  face, as though she was having a good time, Plaintiff was appalled to see such unprofessional

9  activity. Plaintiff then gave a strong tug on the cooler handle and regained possession of her

10 property.

11      Plaintiff walked over to the nearest trash can and dumped the contents of the cooler.

12 While doing this she made a loud announcement to those watching, as she said, "I want

13 everyone here to witness the fact that if anything happens to my mother because these agents

14 are not allowing this food to go on the plane for her, I am going to hold them 100%

15 responsible."

16      Plaintiff gathered up the rest of her property that had already cleared screening and

17 proceeded to the boarding desk. ALBRECHT was still in the pat-down area with KULI,  the

18 caregiver.

19      Plaintiff attempted to board the plane. MASSINGALE, the American Airlines boarding

20 agent, told Plaintiff that she would not be allowed to board the plane because she was a threat to

21 her passengers.

22      Plaintiff got on her knees and begged MAGGINGALE for permission to board.  This

23 trip was going to be hard enough on her mother, as they would not arrive to their destination

24 until 10 p.m. as it was. If they missed this flight, they would also miss their connecting flight in

25 Dallas/Fort Worth.

26

27                    **SECOND AMENDED COMPLAINT ("SAC")**

28                                24                                10/10/12

1    MASSINGALE refused to cooperate. Plaintiff asked for MASSINGALE's supervisor.

2    MASSINGALE said, "I am the supervisor and you will not be boarding out of any of my gates

3    today." Plaintiff explained to MASSINGALE that she was a ticketed passenger and that she

4    had not done anything wrong. MASSINGALE still refused to allow her to board.

5

6                **The Unlawful Detention, Arrest, And Incarceration Of Plaintiff**

7        The first officer then arrived on the scene; Plaintiff later found out that he was classified

8    as the "retaining officer"; his name was Officer KAKUMU. KAKUMU approached Plaintiff

9    and asked her to be seated, which she did.

10       While being seated, Plaintiff overheard the word "vehicle" on KAKUMU's

11   communications device.

12       Plaintiff then asked KAKUMU if she was going to be arrested and taken away to jail.

13   KAKUMU reassured Plaintiff that would not happen when his response was "no."

14       Since Plaintiff had been reassured by KAKUMU that she was not going to be arrested,

15   she started to call American Airlines to see if she could get another agent to speak to

16   MASSINGALE.

17       In the meantime, unbeknownst to Plaintiff, DOE 1, the heavy-set TSA supervisor, had

18   called the Burbank Airport Police in order to have Plaintiff arrested. It is the Plaintiff's belief,

19   and she hereby alleges, that DOE 1 actually had wanted TETTEH to have Plaintiff arrested for

20   having done the tug-of-war with her. When TETTEH refused to do so, DOE 1 took matters into

21   her own hands.

22       When the police arrived, the heavy-set TSA supervisor, DOE 1, gave a false police

23   report, claiming to have been the one involved in the tug-of-war over the cooler of snacks. She

24   claimed that Plaintiff had hit her in the struggle.

25

26

27                    **SECOND AMENDED COMPLAINT ("SAC")**

28                                    25                              10/10/12

1    Back at the boarding gate Plaintiff was still trying to get an American Airlines
2    representative on the phone. She was surprised and intimidated when the two arresting officers,
3    GREEN and ALBARO, approached her and told her to put the phone down. Plaintiff
4    immediately cooperated with the officers

5    GREEN and ALBARO, without any explanation to Plaintiff, unlawfully detained
6    Plaintiff, asked her to stand up and put her hands behind her back, and cuffed her.

7    GREEN and ALBARO separated Plaintiff from her physically and emotionally fragile
8    93-year old mother.

9    GREEN and ALBARO humiliated Plaintiff as they paraded her in public as they
10   escorted her outside the airport toward the police car.

11   GREEN and ALBARO then forced Plaintiff, against her will, into the police car which
12   was located immediately outside the glass doors. Plaintiff was fearful about the welfare of her
13   mother and the caregiver as she was separated from them. Plaintiff was fearful about her own
14   welfare as she had done nothing illegal yet she was being treated like a hard-core criminal.
15   Plaintiff was emotionally distraught and began to cry uncontrollably. This was the beginning of
16   her nervous breakdown.

17   GREEN and ALBARO then followed through with an unlawful Citizen's Arrest with
18   Plaintiff. There was no probable cause. Plaintiff never was allowed the opportunity to face her
19   accuser. After being in the patrol car for approximately 15 minutes, Plaintiff was finally told
20   that one of the TSA agents had placed a Citizen's Arrest on her for battery.

21   Plaintiff repeatedly told GREEN and ALBARO that she did not hit anyone. If the tug-
22   of-war was being considered "battery", then Plaintiff told the officers that she wanted to place a
23   Citizen's Arrest on the agent that had her arrested. Plaintiff said this twice. GREEN and
24   ALBARO refused to honor Plaintiff's request.

25

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                              26                          10/10/12

1    Plaintiff was then transported to the Burbank jail. As soon as they arrived, ALBARO

2  left and Plaintiff was escorted solely by GREEEN.  When GREEN and Plaintiff entered the jail,

3  there was one person at the booking window, 1 person cuffed to the handrail, and then Plaintiff.

4    Plaintiff had been having painful episodes prior to this trip with her knee.  She knew that

5  she would have to have a knee replacement sometime soon.  In the meantime, when her knee

6  throbbed with pain, the only way she could ease the pain would be to take her weight off of it.

7    While waiting to be booked, Plaintiff's knee started to hurt.  Plaintiff politely asked

8  GREEN if she could have a chair to sit down on.  GREEN said that would not be possible.

9  Consequently Plaintiff lowered her body to the ground in order to relieve the weight on her

10  knee.  All of this was done while her hands were still cuffed behind her.  Both the pain and the

11  embarrassment caused Plaintiff to cry uncontrollably.  How could a public servant treat a law-

12  abiding American citizen like this?

13    Plaintiff finally asked GREEN if he could put one of the cuffs on the handrail like the

14  prisoner in front of her; GREEN finally obliged so Plaintiff could have one hand free to wipe

15  her nose and eyes.  Plaintiff faced constant humiliation for the next 5 hours, as she was moved

16  from the booking window, to the holding cell, and finally to the dormitory.

17    The food served in the jail was hellacious; the only thing Plaintiff consumed was the

18  carton of milk.

19    Plaintiff attempted to use the phone in the dorm, but it was not functioning well.  She

20  felt totally isolated and heart-broken that an innocent, U.S. citizen would be treated so

21  hellaciously.

22    Plaintiff was finally released around 9 PM that night.  No bail was paid at the time of her

23  release.

24  ///

25  ///

26

27    **SECOND AMENDED COMPLAINT ("SAC")**

28    27                                          10/10/12

**Plaintiff Succeeds In Getting Her Mother To the Family Wedding Despite The Arrest**

Plaintiff did succeed in getting her mother (ALBRECHT) to the wedding. They were forced to fly out of Los Angeles International Airport, as planes do not fly out of Burbank at night. They departed LAX at 1 AM on April 17, 2009.

American Airlines had indicated to Plaintiff's daughter that as soon as the misunderstanding with the police was resolved, they would get Plaintiff, her mother, and the caregiver onto another flight. The way it was said Plaintiff's daughter thought they were saying that there would be no additional charge and that American Airlines would honor the existing tickets.

**American Airlines Made Plaintiff Buy New Tickets at LAX for a 1 AM Flight**

When Plaintiff, ALBRECHT, and KULI arrived at LAX American Airlines refused to honor the original tickets as passage to Nashville, TN. New tickets had to be issued at the LAX counter. Although credit was given for the money spent on the first set of tickets, a balance of $2606.20 was still charged for the new, on the spot, tickets. Plaintiff later wrote American Airlines requesting a refund. The request was denied.

**TSA Officials Call Special Meeting For All TSA Witnesses On April 17, 2009**

It is the Plaintiff's belief, and she hereby alleges, that there was a meeting called by head TSA officials the day after the airport incident. Said meeting was most likely held at the airport and included all TSA witnesses to the incident that had occurred the day before with Plaintiff. Plaintiff hereby alleges that the purpose of said meeting was to formally instruct all TSA witnesses on how to respond to any questioning. Plaintiff believes that they were encouraged to do their best to make Plaintiff look like a terrible person.

**SECOND AMENDED COMPLAINT ("SAC")**

1  **Plaintiff Had No Problem with TSA Agents and the Cooler of Food On Her Return Trip**
2  **to Burbank From Nashville**

3      When Plaintiff returned to Burbank from Nashville she once again had the cooler filled
4  with snacks for her mother.  When she approached a TSA agent at the Nashville Airport, she
5  explained what had happened to her at the Burbank airport a week prior.  The agent appeared
6  amazed that such unprofessional conduct had been tolerated.  The agent then proceeded to
7  examine the contents of the cooler and personally escorted Plaintiff to a manned, but not busy,
8  screening area.  The agent informed the screener that the items in the cooler were OK and
9  Plaintiff only had to do the standard personal procedures (removal of shoes, etc.) in order to
10  clear the inspection area.  The situation was handled very professionally.  The food and liquid
11  items were allowed to go on the plane.

12

13  **Plaintiff is Formally Charged With Misdemeanor Battery on April 20, 2009**

14      While on her trip to Tennessee, on or about Monday, April 20, 2009, Plaintiff was
15  formally charged with the alleged crime of battery, a misdemeanor.  A criminal complaint that
16  was based upon that allegation was filed in Los Angeles County Superior Court in Burbank,
17  California.

18      Many of the Defendants conspired together in order to make certain Plaintiff was found
19  guilty of the alleged crime of battery.  Such conspiring resulted in the Plaintiff being
20  maliciously prosecuted for a crime she never committed.

21

22  **Renato Medina, Plaintiff's First Criminal Defense Attorney, Is Hired**

23      When HAYS returned from her trip, she hired her first attorney, Renato Medina.

24      MEDINA held off on entering the plea until after the airport surveillance video was

25  made available for viewing.

26

27                        **SECOND AMENDED COMPLAINT ("SAC")**

28                             29                             10/10/12

1    The airport surveillance video finally became available at the Burbank City Attorney's

2  office in the beginning of July, 2009.

3    On July 9, 2009 MEDINA met at the Burbank City Attorney's office with the Assistant

4  City Attorney, Denny Wei (WEI). The purpose of this meeting was to make a copy of the

5  airport surveillance video which was going to be used as part of the Discovery in the Plaintiff's

6  prosecution. Plaintiff's son-in-law, Matt Anderson (ANDERSON), met with the two attorneys

7  and made a copy of the video.

8    WEI was certain to point out a particular scene in the video where Plaintiff is struggling

9  for the return of her cooler. The video shows Plaintiff's hand up in the air and it gives the

10  illusion that Plaintiff might possibly have hit the TSA agent. WEI was very assertive as the

11  three men reviewed the video. When this particular scene appeared, WEI said to ANDERSON:

12  "I can convict on that one scene alone."

13    A plea bargain was offered to Plaintiff by WEI. The conditions for the plea bargain

14  were as follows: (1) Plaintiff would enter a "Guilty" plea, (2) the prosecution would put

15  Plaintiff on probation, where she would not be allowed to enter or fly out of Burbank Airport

16  for six months, (3) the Plaintiff could then go back into Court and rescind the "Guilty" plea, and

17  (4) the prosecution would then dismiss the case. Such an offer might have been a generous one

18  if Plaintiff had been guilty, it was indeed extortion in this situation where Plaintiff was innocent

19  of the alleged crime.

20    After viewing the video, MEDINA advised Plaintiff to take the plea bargain.

21

22           **Medina Withdraws From the Case**

23    Plaintiff refused to plead guilty to a crime she never committed. MEDINA refused to

24  fight for Plaintiff's innocence and withdrew from the case.

25

26

27         **SECOND AMENDED COMPLAINT ("SAC")**

28             30        10/10/12

1    On November 16, 2010 Plaintiff wrote MEDINA and asked him if he could substantiate

2    the fact that he had received a copy of her Summary of Events when he started representing

3    her. Plaintiff included a self-addressed stamped envelope. MEDINA never replied nor

4    acknowledged receipt of her letter.

5    MEDINA never presented Plaintiff with an itemized billing for his expenses, nor did he

6    offer to turn over Plaintiff's file to her. MEDINA has refused to communicate with Plaintiff

7    since he stopped representing her, which has been extremely frustrating for Plaintiff. It is

8    important that she confirm certain issues with him that only he can answer, yet he refuses` to

9    meet with Plaintiff or to return her phone calls.

10    Plaintiff was forced to find a second attorney, on her own, despite the fact that she was

11    still suffering severe emotional trauma from the entire ordeal of being arrested and criminally

12    prosecuted for a crime she never did.

13    Plaintiff started to investigate several local attorneys. She could not find anyone she felt

14    comfortable with.

15

16    **Plaintiff Finally Finds Her Second Criminal Defense Attorney, Mary Frances Prevost**

17    Eventually Plaintiff discovered a criminal defense attorney that she felt she could trust.

18    The attorney was Mary Frances Prevost (PREVOST), who had her principal office in San

19    Diego. She also had satellite offices in Newport Beach and Beverly Hills.

20    PREVOST received Plaintiff's file from MEDINA. Plaintiff is not informed at this time

21    what was contained in said file.

22    On August 22, 2009 Plaintiff wrote a letter to PREVOST with information that validated

23    that the Arrest Report was filled with lies and that the video and the Arrest Report did not agree.

24    ///

25    ///

26

27    **SECOND AMENDED COMPLAINT ("SAC")**

28                                              31                              10/10/12

1

**Plaintiff's Mother Dies 3 Weeks Before Trial Begins**

2    Approximately one year after the airport incident and about 3 weeks prior to the trial

3    date, Plaintiff's mother, then 94-years old, died.  The death and the burial plans were burden

4    enough for the Plaintiff and now laying her mother to rest had a deadline; Plaintiff needed to get

5    everything done before the trial began.

6    Plaintiff's mother was aware that Plaintiff had been handcuffed and arrested on April 16,

7    2009 and that the prosecutors continued to maliciously threaten and prosecute her.  Seeing her

8    daughter (Plaintiff) arrested and then knowing that she was being criminally prosecuted caused

9    Plaintiff's mother severe mental anguish.  Plaintiff was, at all times mentioned, the primary

10   caretaker of her mother.

11   The actions of Defendants contributed to and hastened the death of Plaintiff's mother,

12   and her mother died never knowing that her daughter would ultimately be exonerated and

13   proven innocent of the false charges that the heavy-set supervisor maliciously leveled against

14   her.

15

16

**Trial Begins**

17   Trial was scheduled to begin in April 19, 2010.  The case was to be heard by Hon.

18   Robert P. Applegate, Department 3 in the Burbank Court.  The Court transcript on that day

19   indicated that the session began with the Defense's Motion to Dismiss.  The Court denied the

20   motion.

21   Having had issues in the Burbank Court system with other issues regarding this case,

22   primarily with the Court's refusal to allow proper Discovery to be conducted for the Plaintiff's

23   defense, PREVOST filed a 170.6 CCP whereby the court handling the case would be changed.

24   The Court ordered for the case to be continued the next day at the Pasadena courthouse.

25

26

27

**SECOND AMENDED COMPLAINT ("SAC")**

28

10/10/12

1    On April 20, 2010 Judge Lisa B. Lench, at the Pasadena courthouse, moved the trial to
2  the Glendale Court.  Plaintiff's case was brought before Judge Frederich Rotenberg shortly
3  before noon.

4    Judge Rotenberg called counsels into his chambers; Plaintiff was not party to this
5  meeting.  Judge Rotenberg asked PREVOST what was going on with this case.  PREVOST
6  explained the plea bargain to him and said that Plaintiff was not going to plead guilty to a crime
7  she did not commit nor should she be punished for a crime she never committed.

8    Judge Rotenberg was able to obtain a stipulation from BAKER, an outside attorney for
9  the Burbank City Attorney's office, which stated that the case would be continued for six more
10  months and that "if there are no further negative encounters with law enforcement, the matter
11  will be dismissed at the next hearing date."

12    When BAKER returned to the Burbank City Attorney's office, she reported to WEI that
13  Plaintiff had accepted the plea bargain.  This was a lie.  Plaintiff had never pled guilty, nor was
14  she being put on probation.  Instead, the case was being continued for 6 months and as long as
15  the Plaintiff did not have any negative encounters with the police, the case would be dismissed.

16

17                    **Criminal Case Is Dismissed**

18    Plaintiff had no altercation with the police for the next 6 months.  The case was finally
19  dismissed on October 18, 2010 by Judge Patrick Hegarty in the Glendale Court.  When
20  Plaintiff's criminal defense attorney was later interviewed regarding the case, she said she had
21  "never seen a more malicious prosecution."

22  ///
23  ///
24  ///
25  ///
26

27                    **SECOND AMENDED COMPLAINT ("SAC")**

28                              33                         10/10/12

**TSA Chooses To Maliciously Charge Plaintiff With Civil Fines For Her Actions At The Burbank Airport**

While Plaintiff was waiting for the 6 month continuance to pass (April – October 2012), TSA decided to file an Administrative Civil Action suit against Plaintiff.  The date on the original Complaint was June 16, 2010.  It was assigned "Case No. 2009BUR0030" and later given a docket number of "10-TSA-0088".

Although TSA Inspector DAUM wanted to fine Plaintiff $7500, the TSA Attorney Derrick Ford felt that was too extreme and adjusted the fine to $2500.

TSA accused Plaintiff of violating 49 U.S. Section 1540.109, falsely accusing Plaintiff of assaulting a TSA employee and/or interfering with a TSA employee in the performance of his or her duties.  That complaint was initiated and was negligently, recklessly, and maliciously prosecuted without probable cause.

Plaintiff's criminal defense attorney, PREVOST, was going to handle this case for the Plaintiff.  Plaintiff entered into a contract with PREVOST to represent her.  PREVOST began preliminary arguments for the Administrative Civil Action case.

Plaintiff and PREVOST met in order to further discuss the strategy that would be used in the Civil Enforcement case.  Plaintiff felt comfortable with the proposed actions; she felt that PREVOST would once again help her fight for justice.

Since Plaintiff had argued with PREVOST over the authenticity of the surveillance video numerous times after the April 20, 2010 trial date, Plaintiff believed PREVOST would work with her in helping to prove that the video had been altered.

**The Federal Tort Claim Form Is Filed**

After the criminal case was dismissed on October 18, 2010, PREVOST allegedly filed the Form 95 Federal Tort Claim form the same day.

**SECOND AMENDED COMPLAINT ("SAC")**

10/10/12

**Prevost Withdraws As Legal Counsel For Plaintiff's Administrative Civil Action Suit**

After the criminal case was dismissed on October 18, 2010, PREVOST changed her opinion regarding the surveillance video. PREVOST told Plaintiff to not argue the authenticity of the surveillance video. PREVOST said the video was Plaintiff's best piece of evidence for court and that if she argued the authenticity that the entire video would be thrown out.

Plaintiff argued that she, being an honest person, would not be able to allow an altered video to be presented as truthful evidence when, in reality, she knew it had been altered. PREVOST became very upset with Plaintiff and withdrew from the Administrative Civil Action case.

The Court ordered PREVOST to turn over Plaintiff's file to her immediately so she could prepare for the Civil Enforcement trial, which had been scheduled for December 16, 2010. PREVOST refused to turn the file over to Plaintiff.

**Plaintiff Handles The Administrative Civil Action As A Pro Se Litigant**

Since Plaintiff could not find an attorney to represent herself, she decided to handle the Administrative Civil Action herself. By doing so, she received a large file from FORD, the TSA attorney, with documents (discovery) he planned on using against her in the action.

On December 3, 2010 Judge MC KENNA did allow a telephonic conference call to be made. Those involved in the call included Judge MC KENNA, FORD (the TSA attorney prosecuting the Plaintiff), and the Plaintiff. It was during this telephonic conference that Derrick Ford, seeing the frivolousness of the remaining suit, then caused the complaint to be withdrawn. This was a termination on the merits.

As a result of the aforesaid administrative civil action, Plaintiff incurred legal expenses, to be determined according to proof, and also suffered anxiety, humiliation, and distress.

**SECOND AMENDED COMPLAINT ("SAC")**

1

2        **Plaintiff Continued To Have Problems Obtaining Files From Prevost**

3            Plaintiff realized the importance of getting her file from PREVOST. Since she no

4    longer had a civil attorney to represent her in Federal court, she came to the conclusion that she

5    might have to do her Federal case as a pro se litigant. The information contained in her file, still

6    being retained by PREVOST, was critical in order for her to prepare her lawsuit.

7

8    **Plaintiff Begins Doing a Thorough Investigation Of Her Case Starting in Januaary, 2011**

9            After 18 months of relentless persecution from Defendants, Plaintiff began her own

10   investigative work. As she investigated, more and more corruption became apparent. When

11   stories did not match up, Plaintiff knew lies were being told.

12           Plaintiff flew to Salt Lake City on March 8, 2011. This trip was intentionally planned so

13   that she would be flying out of the same terminal as the one she had been arrested at in 2009 at

14   the Bob Hope Airport. Plaintiff wanted to confirm the location of equipment to see if what she

15   recollected was correct. Mentally she walked herself through the events of that day; everything

16   seemed to fit in properly, just as she had recalled.

17           It will only be after Discovery has been conducted that the truths will come forward and

18   this case can be successfully tried.

19

20                **Dave Vogl, His E-mail and His Cell Phone Video**

21           It appears that on April 30, 2009 TOOLES sent an e-mail to DAUM and MORALES

22   with an e-mail and cell phone video from VOGL. Even at this early date, information started to

23   be fabricated to make Plaintiff look like a very confrontational individual. VOGL's e-mail

24   made the following statement: "She (Plaintiff) was screaming and slapping the TSA agents, was

25

26   _____

27                **SECOND AMENDED COMPLAINT ("SAC")**

28                              36                          10/10/12

1 uncooperative, and disrupted the entire terminal area. I feared for their safety as she was so

2 unruly."

3      Discrepancies emerged.  When the stories told did not match, it was apparent that

4 someone was trying to hide something.  Below are the discrepancies Plaintiff was able to pick

5 out:

6   1.  The e-mail from VOGL was directed to TOOLES and a cc was sent to

7      jbourbonnais@atssti.  In a personal interview, VOGL stated that the e-mail and cell

8      phone video were sent to American Airlines.

9   2.  The e-mail was cc'd to a jbourbonnais@atssti.com.  Plaintiff's research showed that

10      atssti.com is a website for Airport Terminal Services.  Why was an e-mail sent between

11      officials in TSA being sent to someone at ATS?

12   3.  In his e-mail VOGL mentioned the name of the American Airlines boarding agent (Ms.

13      Jean Masingale) and in the interview VOGL said he did not know the name of the agent.

14   4.  In the e-mail VOGL's e-mail address was xftrplt@gmail.com yet when Plaintiff was

15      going to send him a copy of his e-mail and remarks he requested that it be sent to

16      david@vogls.com.

17   5.  When Plaintiff mentioned the defamatory e-mail, VOGL had no idea what she was

18      talking about, yet he allegedly wrote it.

19   6.  VOGL stated that he was flying out to San Francisco on American Airlines the day of

20      the incident.  American Airlines had no record of VOGL flying out of Burbank  on

21      4/16/09.

22   7.  VOGL stated that he sent the cell phone video in to American Airlines.  American

23      Airlines legal department claims that no video came through to them.

24      It is the Plaintiff's belief, and she hereby alleges, that someone, and Plaintiff believes it

25 to be either DAUM or TOOLES, obtained an e-mail address of xftrplt@gmail.com under the

26

27             **SECOND AMENDED COMPLAINT ("SAC")**

28                   37                  10/10/12

1    name of Dave Vogl. The defamatory e-mail was then sent via xftrplt@gmail.com to TOOLES

2    along with the cell phone video. It is the Plaintiff's belief that TOOLES was a direct participant

3    in the defamation conspiracy and was aware of what was going on. TOOLES then forwarded

4    the e-mail and cell phone video to DAUM.

5         On February 12, 2011 Plaintiff called VOGL, a witness to the airport incident. VOGL

6    had sent in a cell phone video he had taken at the airport while Plaintiff was trying desperately

7    to get on board her American Airlines flight. When she mentioned to him the very defamatory

8    e-mail he had allegedly sent, he knew nothing about it and asked for him to be sent a copy.

9    VOGL gave Plaintiff a totally different e-mail address from that which was on the defamatory

10    e-mail.

11         On February 18, 2011 Plaintiff once again tried to contact VOGL. Plaintiff left another

12    message on his voice mail and never received a call back from him.

13         On March 9, 2011 Plaintiff spoke with Jeff Frimer, an independent IT technician that

14    worked for TSA at the airport. When Plaintiff mentioned to FRIMER that there was a break in

15    the cell phone video, he confirmed to her that that was the way they had received it. Yet later

16    testimony from VOGL stated that it was one continuous recording. The questions one must ask

17    regarding this is 1. What was cut out? 2. Who cut it out? 3. Why did they cut it out?

18

19                       **Vogl's Cell Phone Video Is Modified**

20         DAUM then sent the cell phone video to FRIMER, an IT Specialist that was contracted

21    out by TSA. Her e-mail request stated "I need this video, taken with a cell phone, converted to

22    something we can view." Generally cell phone files are easily viewed on a standard computer.

23    This comment from DAUM does not make any sense.

24

25

26

27                    **SECOND AMENDED COMPLAINT ("SAC")**

28                           38                   10/10/12

1

2

**Plaintiff Attempts to Find Answers From the Transportation Security**

**Administration**

3    On November 23, 2010 Plaintiff wrote FORD a letter asking for picture identification of

4    the TSA agents. In this letter Plaintiff told FORD that if he looked at the photo ID and the

5    video, he would easily see that the video showed that the tug of war was with screener

6    TETTEH, not the heavy-set supervisor. Ford refused to provide the information requested.

7    On February 10, 2011 Plaintiff wrote to the Transportation Security Administration,

8    Office of Civil Rights and Liberties, External Compliance Division. In this letter she described

9    what had happened to her. She explained that the evidence in her criminal prosecution had been

10   altered to make her look guilty of a crime she never committed. She never received a response

11   back from them.

12   On Janruay 15, 2011 Plaintiff wrote to FORD. As an attorney FORD's duty was to be

13   certain that he was making accurate allegations. Plaintiff pointed out to FORD that if he spoke

14   to other TSA agents (ie. WALKER or BERG) that witnessed what went on at the airport, that he

15   would probably discover the truth. Plaintiff told FORD that she did not trust DAUM. If FORD

16   had any real integrity, he would have asked for the identification cards with pictures of the

17   screener and supervisor that interacted with Plaintiff at the airport. Once a truth was made

18   known to him, it would have been clear that Plaintiff was telling the truth. FORD failed to

19   show any sign of good faith; he did not have any investigative work done.

20   On January 17, 2011 Plaintiff wrote a letter to WALKER, telling him that she knew that

21   he knew what really happened and that she was wondering if WALKER would be honest

22   enough to step forward and tell the truth, namely the the tug-of-war was with TETTEH and that

23   at no time did Plaintiff ever hit anyone. Plaintiff never heard back from WALKER.

24   On February 1, 2011 Plaintiff left a message with STILL'S secretary for him to call her

25   back. No call back was ever received.

26

27   **SECOND AMENDED COMPLAINT ("SAC")**

28                                     39                                     10/10/12

1  On February 2, 2011 Plaintiff called DAUM to let her know that she was pretty certain

2  that she was aware of what had been done. DAUM informed Plaintiff that she would not talk

3  with her and that all communications needed to be channeled through FORD. DAUM then

4  hung up on Plaintiff.

5  On February 7, 2011 Plaintiff had a conversation with BURNS, the TSA blogger. When

6  she asked BURNS if he had seen the video right after the incident happened, he said he would

7  have to research that and would call Plaintiff back. He also could not answer Plaintiff's

8  question as to why, in internet communications with other officials, he said he had posted one of

9  Plaintiff's comments when in actuality the comment never showed up on the blog.

10  On February 22, 2011 Plaintiff did try to talk with WALKER at his residence. He told

11  her she should not be there and closed the door on her face.

12  On April 11, 2011 Plaintiff tried several times to reach CAHILL, the Security Director

13  for TSA at the Burbank Airport. She left her name and a return phone number. CAHILL never

14  returned her call.

15

16  **Plaintiff Attempts to Find Help From The Los Angeles District Attorney's Office**

17  On November 1, 2010 Plaintiff wrote a very detailed letter to Dave Demerjian, Head

18  Deputy of the Los Angeles District Attorney's Office, Public Integrity Division. DEMERJIAN

19  passed the complaint on to MOULIN in the Judicial System Integrity Division.

20  On November 4, 2010 Plaintiff sent a letter and a DVD in to the Los Angeles District

21  Attorney's Office. In this document she specifically told the DA's office that the integrity of

22  the justice system had been compromised and that someone had tampered with the evidence in

23  her criminal prosecution. Plaintiff also informed MOULIN that the Court had not operated

24  justly, as they had denied PREVOST, Plaintiff's attorney, the right to discovery. MOULIN

25  refused to do anything.

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28  40                                    10/10/12

1        On January 11, 2011 MOULIN wrote Plaintiff and stated that there was insufficient

2    evidence to prosecute. He said the case was being closed, but he did leave the door open and

3    said that if anything new should materialize to let him know and he would reconsider opening

4    the case.

5        On January 15, 2011 Plaintiff sent a very detailed e-mail to MOULIN describing all of

6    the actions that had offended Plaintiff. She was very explicit and explained that MOULIN had

7    a public duty to protect and defend innocent people, yet he refused to do anything about

8    pursuing the criminal acts that had been committed against Plaintiff.

9        On April 5, 2011 Plaintiff contacted James Garrison, who took over MOULIN's position

10   at the Los Angeles District Attorney's office, after MOULIN was transferred out to a field

11   office. Plaintiff discussed the tampering with evidence that had been done in her case.

12   Garrison told her to put everything in writing and they would look at the case.

13       On April 7, 2011 Plaintiff did as she was told and put everything down in writing for

14   GARRISON. She supplied him with detailed documents and a DVD.

15       Plaintiff corresponded with GARRISON on May 10, 2012 and May 31, 2012, bringing

16   him up to date with the criminal acts of AIKENS, namely that she pretended to be the

17   supervisor at the airport even though she was not present at the incident. Plaintiff had never

18   even seen a picture of AIKENS until her process server submitted a Facebook picture of her.

19   Plaintiff immediately told the process server that he has been giving documents to the wrong

20   person. To date, the heavy-set supervisor, DOE 1, who really did the Citizen's Arrest on

21   Plaintiff, has still not been located and identified. GARRISON is intentionally declining to

22   prosecute because he feels "there is not sufficient evidence." Plaintiff has asked Garrison if she

23   could simply come into his office and be allowed to show Garrison her evidence, which very

24   clearly points out that AIKENS was NOT involved in the airport incident. Garrison has refused

25   to allow such a meeting to take place. He is indeed abusing his title and is allowing a criminal

26

27                       **SECOND AMENDED COMPLAINT ("SAC")**

28                       10/10/12

1  to roam the streets, where in essence his job responsibility is to have a proper investigation

2  done, after which he will have sufficient evidence to prosecute.

3

4  **Plaintiff Attempts to Find Help From the Burbank City Attorney's Office**

5  On November 29, 2010 Plaintiff wrote a very detailed letter to Dennis Barlow, the

6  Burbank City Attorney at the time. In this letter Plaintiff clearly pointed out that her name had

7  been blemished by the entire prosecution process, that the videos used in her prosecution had

8  been tampered with, that her right to make a Citizen's Arrest had been denied by the Burbank

9  Airport Police, and that her mother's rights had been violated as an individual that was

10  protected under the Americans With Disabilities Act (ADA) as well as under the TSA

11  guidelines for individuals with physical disabilities. Plaintiff asked BARLOW to meet with her

12  so she could point out the wrongs that had been done to her throughout the criminal

13  proceedings. BARLOW refused to meet with her. Plaintiff believes that BARLOW was aware

14  of the corruption within his department and he was merely trying to shield himself from further

15  justifiable attacks.

16  On December 9, 2010 BARLOW sent a reply letter to Plaintiff where he stated that it

17  would be inappropriate for them to meet since his office handled the prosecution of the case.

18  BARLOW defended the integrity of WEI and personally vouched for his integrity and high

19  standard of ethics. He concluded in his letter that "as the City Attorney of the City of Burbank

20  there is really nothing that I could do."

21  BARLOW, as the leader in his department, owed Plaintiff the duty to have Plaintiff's

22  allegations properly investigated. At no time should he have assumed that WEI was right when

23  there was concrete evidence to show that WEI was prosecuting on a falsified police report.

24

25

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28  42                                    10/10/12

On December 20, 2010 Plaintiff sent a very detailed package of documents to BARLOW so there was no misunderstanding regarding the corruption that was involved in this case. BARLOW chose to ignore everything Plaintiff discussed.

On January 27, 2011 Plaintiff wrote BARLOW and REINKE with a last plea for help. It is very hard for Plaintiff to live knowing that individuals that have committed felonious acts against her are out on the streets to this very day. Plaintiff received no response from either party.

### Plaintiff Attempts To Find Help From The Burbank Police Department

On January 27, 2011 Plaintiff filed a Burbank Police Department Complaint of Employee Misconduct where she alleged that someone did a switch with the airport surveillance video; the original was removed and an altered version was substituted.

Documentation from the Burbank City Attorney's office showed that the DVD had been checked out twice before WEI received a copy. ROSS checked the DVD out on June 3, 2010 and checked it back in on June 5, 2010. On July 2, 2010 Officer Rich Ellis from the Burbank Airport Police checked out the DVD for approximately 1 hour in order to make copies.

No follow-up regarding the complaint has been supplied to the Plaintiff.

On January 28, 2011 Plaintiff made a call to ROSS at the Burbank Police Department. Ross confirmed with Plaintiff that he did take the DVD out of the evidence locker in order to make a copy of it. This statement contradicts the Declaration given by ROSS in Defendant BURBANK CITY ATTORNEY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, dated June 22, 2011 where he stated "I could not make copies of the surveillance CD because it was not compatible with the Burbank Police Department computers."

On February 21, 2011 Plaintiff talked with Lt. HAWVER, who was investigating Plaintiff's complaint with the Burbank Police Department. She explained her frustration in not

### SECOND AMENDED COMPLAINT ("SAC")

1   being able to find out the details regarding who had checked out the airport DVD in the

2   evidence locker.  No one would give her an answer. HAWVER refused to give her the answer

3   and redirected Plaintiff to her concerns about the video.

4      Plaintiff straight out asked Hawver if he felt ROSS was a man of integrity.  There was

5   no response.

6      Plaintiff was very explicit regarding the fact that she wanted to know who made the

7   copy of the airport video and burned the DVD.  She still has not been given this information.

8      HAWVER tried to defend the DVD by pointing out the date and time stamp on the file;

9   Plaintiff told HAWVER that she believed that information could easily be manipulated.

10  Plaintiff's major issue with the Burbank Police Department was the fact that she believed there

11  was a high probability that Officer ROSS was involved in the substitution of the altered video

12  for the original in the evidence locker.

13     HAWVER said that he had viewed the video.  When Plaintiff had spoken with ROSS he

14  seemed to indicate that he could not get the video to work on the police station computers.  If

15  Hawver had viewed the video, where did he view it?  The video is not a simple "hit play"

16  recording.  Could he have possibly viewed it with other individuals working on the conspiracy

17  trying to make Plaintiff look guilty of hitting the TSA agent? Why was his name not on the log

18  for checking the DVD out?

19     Plaintiff never heard back regarding the investigation HAWVER had done.

20     On April 6, 2011 Plaintiff spoke with Watch Commander Sergeant Sanchez.  Plaintiff

21  explained that felony crimes had been committed and she wanted to see them prosecuted.

22  Sanchez promised Plaintiff that he would look into it and have someone call her back.  No one

23  called her back.

24     On April 7, 2011 Plaintiff left a message for Lt. Hawver to please call her; she still had

25  not heard back from him regarding the investigation he was running at the Burbank Police

26

27        **SECOND AMENDED COMPLAINT ("SAC")**

28            44        10/10/12

1    Department.  Later in the day Hawver did contact Plaintiff.  He told her the only way the altered

2    e-mail could be prosecuted would be for Vogl to press charges, since it was his name and

3    identity that was being falsified.  Plaintiff told him that she was the victim as well because she

4    had been damaged by the lies that were stated.  HAWVER did nothing in response to Plaintiff's

5    request.

6         On April 7, 2011 Plaintiff left a message for Sergeant Sanchez at the Burbank Police

7    Department.  He was going to have someone call her back the day before.  No one ever returned

8    the call.

9         On April 8, 2011 Plaintiff wrote Detective Gordon regarding the crimes that had been

10   committed against her.  Gordon never replied back nor did he take any action.

11        On April 27, 2011 Plaintiff left a message for Detective Gordon at the Burbank Police

12   Department.  She expressed her concern that the investigative report she requested had not been

13   completed.

14        On May 2, 2011 Plaintiff left a voice mail for Lt. Hawver at the Burbank Police

15   Department.  She asked about the status of the investigative report.

16        On May 3, 2011 Plaintiff left a message for Police Chief LA CHASSE from the

17   Burbank Police Department to call her.

18        On May 3, 2011 Plaintiff left a voice message for Lt. HAWVER; she asked him to

19   return the call as soon as possible.  He did not return the call.

20        On May 16, 2011 Plaintiff tried once more to reach Lt. HAWVER.  No response was

21   received by HAWVER.

22        On July 11, 2011 Plaintiff received a letter from LA CHASSE, the Chief of Police for

23   the Burbank Police Department.  In this letter he made the statement that their investigation

24   showed no corruption with Officer ROSS and no evidence of tampering with the video.  In

25   actuality the Burbank Police Department had evidence to show that tampering had been done.

26

27                    **SECOND AMENDED COMPLAINT ("SAC")**

28                                        45                              10/10/12

1  Plaintiff had clearly described to the Burbank Police Department that the tug-of-war

2  over the cooler did not happen in the screening area.  Plaintiff would have been off-screen, to

3  the left,  as she pursued the two TSA agents that were walking away with her possessions.

4  Plaintiff finds it hard to believe that there was not a camera on the pat-down region where her

5  mother was, nor was there an agent on the boarding gate area.

6  Such was not the case, however, as Plaintiff was "onscreen" for most of the

7  confrontational video.  The mere fact that there was only 1 camera angle provided by TSA when

8  in actuality there were almost a dozen camera bubbles on the ceiling area that was proximate to

9  the screening area that Plaintiff had been in.

10  Plaintiff finds it extremely unusual that in a high security area there was only one

11  camera running.  Plaintiff has tried multiple channels to find out if there were any more cameras

12  running in the terminal where the incident took place. No one has attempted to giver Plaintiff

13  any help.

14  On August 1, 2011 Plaintiff spoke with Captain Cremins, who was the Commander for

15  the Investigative Division of the Burbank Police Department.  He informed Plaintiff that the

16  issues she wants addressed do not fall under the jurisdiction of the Burbank Police Department

17  because it is a federal matter.  Plaintiff tried to emphasize the fact that the criminal act of

18  tampering with evidence occurred in the city of Burbank.  Captain Cremins continued to insist

19  that it was a federal matter and refused to do any investigative work.

20

21  **Plaintiff Attempts to Find Help From The Mayor of Burbank**

22  On December 11, 2010 Plaintiff sent an e-mail to REINKE, the mayor for the city of

23  Burbank.  In this e-mail Plaintiff asked Reinke to organize a meeting with Dennis Barlow,

24  Denny Wei, the Chief of Police for the Burbank Police Department, the individual in charge of

25  the evidence at the Burbank Police Department, the Chief of Police at the Burbank airport, and

26

27  **SECOND AMENDED COMPLAINT ("SAC")**

28                     10/10/12

1   the individual in the security room at the airport that not only saw the video recording(s) but

2   also made a copy for the evidence locker. No action was taken on this request.

3

4                   **Plaintiff Attempts To Find Help From The Burbank Airport Police**

5           On January 12, 2011 Plaintiff had an interview at the Camarillo Police Department with

6   NEIL and FURGIVELE, both officers from the Burbank Airport Police. Plaintiff had been

7   warned by Attorney Allan Ball that this interview was not intended to help Plaintiff, but rather

8   was a way they were able to gather information against Plaintiff. Despite the warning, Plaintiff

9   was willing to give the officers a chance to prove themselves.

10          This was an internal affairs interview for the Burbank Airport Police to further

11  investigate the offenses that had taken place at the airport and jail.

12          When Plaintiff arrived at the Police Station, NEIL and FURGIVELE had already

13  arrived. They had the interview room set up with various video and audio recorders. Plaintiff

14  had brought along her professional Sony camera to record the interview. As she started to set

15  up her camera, NEIL dismissed himself. When NEIL returned, he informed Plaintiff that their

16  legal department had informed him that if the interview was to continue that video could not be

17  recorded. Plaintiff told the officers that if she could not video record the interview, she did not

18  want them to video record it either. They agreed to turn off their video cameras.

19          Everyone decided that audio recording of the interview would be acceptable. Later

20  Plaintiff discovered that the video system in the conference room was used, despite the fact that

21  Plaintiff had specifically that she did not want to have the session video recorded. NEAL was

22  knowledgeable about the recording.

23          Plaintiff had many questions she needed to have answered. Neither NEAL nor

24  FURGIVELE found answers for any of her questions and the "report' they produced was

25  worthless. Attorney Alan Ball had accurately predicted what would happen.

26

27                           **SECOND AMENDED COMPLAINT ("SAC")**

28                                            47                        10/10/12

1    On January 13, 2011 Plaintiff sent an e-mail to NEAL thanking him for the interview the

2    day before. She also sent him a large assortment of attachments to assist him with the

3    investigation. Despite Plaintiff's due diligence in assembling the documents for the

4    investigative officers, none of the Plaintiff's questions were ever answered.

5    On January 18, 2011 NEIL sent Plaintiff a summary of points that he picked out from

6    their interview. The majority of issues were on the list. He did not cover, however, the

7    question as to why GREEN and ALBARO did not follow through with Plaintiff's Citizen Arrest

8    on the individual that placed the Citizen's Arrest on her. If they had and if the video had been

9    viewed right away by all parties involved, the case would never have been prosecuted. It would

10   have been very clear that the supervisor, that had placed the arrest on Plaintiff, had not told the

11   truth.

12   On February 1, 2011 Plaintiff left a voice mail for Chief SKVARNA; she informed him

13   that NEAL had just hung up the phone on her. She also informed SKVARNA that NEAL was

14   not doing a very good job with his position on the force and in her book he deserved to be fire.

15   SKVARNA never returned her call.

16   On March 7, 2011 Plaintiff left a voice mail message for NEAL inquiring when she

17   might be able to see the investigative report. No reply was received.

18   On March 10, 2011 Plaintiff left a message for Commander SCHMIDT at the Burbank

19   Airport Police. Plaintiff was in the process of preparing her Original Complaint for Federal

20   Court and wanted to have the information that was on the investigative report that had been

21   promised to her. No information was produced.

22

23                     **Plaintiff Attempts To Find Help From Other Civil Officials**

24   On February 2, 2011 Plaintiff once again tried to express herself in writing to

25   individuals she considered to be civil servants and that were working for her. She sent letters to

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                        48                              10/10/12

1  Diane Feinstein, Barbara Boxer, and Elton Gallegly.  If she did receive a response, it was a form
2  letter that did not address any of her personal issues.

3          On February 18, 2011 Plaintiff did receive a letter back from Diane Feinstein which told
4  her Feinstein could not help her with her court case.  She did state, however, if any help was
5  needed regarding a Federal agency that she should be contacted.  On March 4, 2011 Plaintiff
6  once again wrote Diane Feinstein's office, asking her if the Department of Homeland Security
7  was not a federal agency?  There was no reply.

8          On March 14, 2011 Plaintiff called her House Representative, Elton Gallegly, in
9  Washington, D.C.  When the receptionist heard that Plaintiff has to record the conversation, she
10  (the receptionist) hung up on Plaintiff.

11          On February 16, 2011 Plaintiff talked with the Los Angeles FBI and voiced her concern
12  with the corruption in TSA and Homeland Security.  The FBI refused to open an investigation
13  and told Plaintiff she needed to work with the agencies she was having problems with.  Plaintiff
14  made the statement, "So you think the crooks are going to prosecute themselves?"

15          On March 11, 2011 Plaintiff went to the Los Angeles FBI office on Wilshire Blvd. in
16  Los Angeles.  When she finally was called into the interview room, she told the agent that she
17  wanted the felons that had altered evidence in her criminal prosecution to be prosecuted..  The
18  agent said to her, "But your criminal case has been dismissed."  Plaintiff told the agent that did
19  not matter, that the felonies had still been committed.  Plaintiff lost faith in the Federal
20  government when the agent told her, "We're not going to do anything."

21          Following the advice of the FBI, Plaintiff made a call to Homeland Security in
22  Washington, D.C.  She was put on hold for 15 minutes and no one ever answered the phone.

23  ///

24  ///

25  ///

26

27                          **SECOND AMENDED COMPLAINT ("SAC")**

28                                              49                              10/10/12

1

**Plaintiff Attempts To Find Help From the U.S. Attorney**

2   On February 3, 2011 Plaintiff contacted the U.S. Attorney's Office in Los Angeles.

3   They informed her that they had a form they would send to her for her to write her complaint

4   on.

5   On February 4, 2011 Plaintiff wrote U.S. Attorney Eric Holder a very assertive letter

6   demanding that justice be done. Plaintiff never received a response back.

7   On February 10, 2011 Plaintiff filled out a complaint form for BIROTTE, the U.S.

8   Attorney in Los Angeles.

9   On March 22, 2011 the U.S. Attorney's Office, Central District of California

10   acknowledged receiving Plaintiff's complaint. In the letter the following statement was made:

11   "According to your package, you stated that you have already reported this situation to the

12   correct agency, if they request our assistance they will contact us directly. Please contact the

13   agencies that you have notified for any further information or updates." It was obvious to

14   Plaintiff that whoever handled her complaint did not understand what was going on. Plaintiff

15   has issues with the Department of Homeland Security altering evidence used in a criminal

16   prosecution. Do they honestly think the Department of Homeland Security is going to

17   investigate their own crime?

18

19   **Plaintiff Attempts To find Help From the Burbank-Glendale-Pasdena Airport**

20   **Authority And Their Operations Personnel**

21   On February 7, 2011 Plaintiff talked with STILL at the Burbank Airport. He told her the

22   case was under police investigation and that he could not comment on the case. He hung up on

23   Plaintiff.

24   On February 8, 2011 Plaintiff attempted to get hold of Dan Feger, the Executive

25   Director of Bob Hope Airport. FEGER was not in and Plaintiff left a message for him to call

26

27   **SECOND AMENDED COMPLAINT ("SAC")**

28                                      10/10/12